23-7544
*Gardner-Alfred v. Federal Reserve Bank of New York*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

————————

August Term, 2024

Argued: December 4, 2024     Decided: July 2, 2025

Docket No. 23-7544-cv

————————

LORI GARDNER-ALFRED, JEANETTE DIAZ,

*Plaintiffs-Appellants*,

— v. —

FEDERAL RESERVE BANK OF NEW YORK,

*Defendant-Appellee.*

————————

B e f o r e:

LYNCH, NARDINI, and LEE, *Circuit Judges*.

————————

In 2021, defendant-appellee the Federal Reserve Bank of New York (the "Federal Reserve") adopted a policy requiring all employees to be vaccinated against Covid-19 unless they were granted a religious or medical exemption. Plaintiffs-appellants Lori Gardner-Alfred and Jeanette Diaz, employees at the Federal Reserve, applied for religious exemptions, asserting that receiving a

Covid-19 vaccine was against their religious beliefs. The Federal Reserve denied their requests and ultimately fired them for violating the vaccination policy. Gardner-Alfred and Diaz assert that the Federal Reserve's actions impinged on their religious liberties guaranteed by the Free Exercise Clause of the First Amendment and various federal statutes.

Following discovery, the district court granted the Federal Reserve's motion for summary judgment on all of Gardner-Alfred's and Diaz's federal claims, concluding that there was no genuine dispute of fact that Gardner-Alfred and Diaz did not have sincerely held religious objections to the Federal Reserve's vaccination policy, and that the vaccination policy did not conflict with Diaz's professed religious beliefs.

We conclude that the district court (Liman, *J.*) correctly granted summary judgment on Gardner-Alfred's claims. We find, however, that disputed issues of material fact preclude summary judgment on Diaz's claims. We also conclude that the district court did not abuse its discretion in granting the Federal Reserve's motion for discovery sanctions, locating no clear error in the district court's findings that Gardner-Alfred and Diaz repeatedly neglected their discovery obligations, withheld relevant documents, and flouted the district court's orders. We therefore AFFIRM in part and VACATE in part the judgment of the district court, and REMAND the case for further proceedings.

———————————

STEVEN M. WARSHAWSKY, The Warshawsky Law Firm, Mt. Kisco, NY (John G. Balestriere, Michael J. Weiner, Balestriere Fariello, New York, NY *on the briefs*), *for Plaintiffs-Appellants*.

ALEX LEONARD (Daphne Ha, Michele Kalstein *on the brief*), Federal Reserve Bank of New York, New York, NY *for Defendant-Appellee*.

———————————

2

GERARD E. LYNCH, *Circuit Judge*:

Defendant-appellee the Federal Reserve Bank of New York (the "Federal Reserve") declined the requests of plaintiffs-appellants Lori Gardner-Alfred and Jeanette Diaz for a religious exemption from a policy that required all Federal Reserve employees to be fully vaccinated against Covid-19. The Federal Reserve then fired Gardner-Alfred and Diaz when they failed to comply with that vaccination policy. Gardner-Alfred and Diaz sued, claiming that the Federal Reserve's actions infringed upon their religious liberties in violation of, *inter alia*, the Religious Freedom Restoration Act, the Free Exercise Clause of the First Amendment, and Title VII of the Civil Rights Act of 1964.

The district court (Lewis J. Liman, *J.*) granted summary judgment to the Federal Reserve on Gardner-Alfred's and Diaz's claims. In addition, the district court found that, while litigating their claims, Gardner-Alfred and Diaz both engaged in discovery misconduct, and on motion of the Federal Reserve, imposed sanctions in the form of adverse inference instructions and an award of attorneys' fees and expenses occasioned by that misconduct. On appeal, Gardner-Alfred and Diaz challenge the district court's imposition of discovery sanctions and grant of summary judgment against them.

3

We conclude that the district court did not abuse its discretion by imposing sanctions and that the district court properly granted summary judgment on Gardner-Alfred's claims. We also conclude, however, that disputed issues of material fact about whether Diaz's sincerely held religious beliefs conflict with the Federal Reserve's vaccination policy preclude summary judgment against Diaz. Accordingly, we AFFIRM in part and VACATE in part the judgment of the district court, and REMAND the case for further proceedings.

## BACKGROUND

Gardner-Alfred and Diaz were executive assistants to C-suite officers at the Federal Reserve when the Covid-19 pandemic began. Like many other employers, the Federal Reserve responded to the pandemic by shifting most of its employees, including Gardner-Alfred and Diaz, to remote work starting in March of 2020. That policy continued until, in the summer of 2021, the Federal Reserve announced its intention to begin "a phased return to the office after Labor Day," which required employees to return to work in person several days a week. App'x 893.

As part of that transition, the Federal Reserve adopted a vaccination policy, which provided that "[a]s a condition of employment, every individual

4

employed by the [Federal Reserve] must be fully vaccinated against COVID-19, as defined in applicable public health guidance, and receive a booster shot within thirty (30) days of becoming eligible to do so, unless they receive an accommodation related to this requirement." *Id.* 56. As relevant here, employees could apply for an exemption from the policy based on "a sincerely held religious belief that precludes receiving the COVID-19 vaccine" by submitting "a religious accommodation request form" with a "clear[]" explanation as to "why receiving the COVID-19 vaccination would be contrary to their religious beliefs." *Id.* 57.

Gardner-Alfred and Diaz sought religious exemptions from the vaccination policy on August 9, 2021 and September 1, 2021, respectively. The Federal Reserve granted them both "temporary accommodation[s]" from the vaccination policy until November 30, 2021. *Id.* 86, 1092. On November 29, however, the Federal Reserve decided not to grant Gardner-Alfred and Diaz permanent religious accommodations, indicated that their temporary accommodations would expire on January 7, 2022, and informed them that they would need to be vaccinated by December 26, 2021 to comply with the vaccination policy. Ultimately, Gardner-Alfred and Diaz did not get vaccinated and, as a result, they were fired on March 14, 2022.

5

I.      **Procedural History**

    A.      *Early Stages of the Lawsuit*

Prior to their termination, Gardner-Alfred and Diaz filed this lawsuit in the Supreme Court of New York, seeking to enjoin the Federal Reserve from firing them for their refusal to comply with the vaccination policy.[1] The Federal Reserve timely removed the case to the United States District Court for the Southern District of New York.

Gardner-Alfred and Diaz then filed an amended complaint, the operative complaint for purposes of this appeal, alleging that the Federal Reserve's actions violated the Religious Freedom Restoration Act ("RFRA"), the Free Exercise Clause of the First Amendment, Title VII of the Civil Rights Act of 1964, New York State's Human Rights Law, and New York City's Human Rights Law. On the Federal Reserve's motion to dismiss the amended complaint, the district court dismissed the claims under New York State's and New York City's Human

---

[1] Although the state court issued a temporary restraining order, prohibiting the Federal Reserve from firing Gardner-Alfred and Diaz, after the case was removed to federal court, the district court dissolved the temporary restraining order because Gardner-Alfred and Diaz failed to "satisfy the requirements of Federal Rule of Civil Procedure 65" and failed to "carr[y] their burden of justifying continuing injunctive relief." *Gardner-Alfred v. Federal Reserve Bank of New York*, No. 22-cv-1585, 2022 WL 748249, at *3–4 (S.D.N.Y. Mar. 11, 2022).

6

Rights Laws but permitted the federal claims to proceed. *See Gardner-Alfred v. Federal Reserve Bank of New York*, 651 F. Supp. 3d 695, 698 (S.D.N.Y. 2023).

### B.    Discovery

After almost a year of discovery, the Federal Reserve moved for discovery sanctions, alleging that Gardner-Alfred and Diaz were flouting their discovery obligations under the Federal Rules of Civil Procedure and the district court's discovery orders. After full briefing and a hearing, the district court found that Gardner-Alfred and Diaz had repeatedly failed to comply with their discovery obligations, violated the court's discovery orders, and withheld relevant, potentially damaging documents.[2]

Based on the nature of Gardner-Alfred's and Diaz's non-compliance with their discovery obligations and the court's orders, the district court concluded that Gardner-Alfred and Diaz acted "willful[ly]" and "in bad faith" and that their misconduct warranted the imposition of sanctions under Federal Rules of Civil Procedure 16(f), 37(b), and 37(c). *Gardner-Alfred v. Federal Reserve Bank of New York*, No. 22-cv-1585, 2023 WL 3495091, at *8–14 (S.D.N.Y. May 17, 2023). In addition, the district court found that sanctions under Federal Rule of Civil

---

[2] Gardner-Alfred and Diaz do not challenge those factual findings on appeal.

Procedure 26(g) were warranted against Diaz, Gardner-Alfred, and their counsel because they had falsely represented on numerous occasions that they had produced all responsive documents. *Id.* at *14–16.[3]

Having concluded that sanctions were in order, the district court turned to determining "the least harsh sanction that can provide an adequate remedy" for such blatant misconduct. *Id.* at *16 (quotation marks omitted). First, the district court concluded that the Federal Reserve was

> entitled to reasonable expenses and attorneys' fees incurred in connection with (1) the [sanctions] motion, (2) call and email correspondence with opposing counsel from March 21 to the present date regarding [Gardner-Alfred's and Diaz's] discovery deficiencies; as well as (3) expenses incurred in connection with their February 27 motion to compel.

*Id.* The district court held counsel for Gardner-Alfred and Diaz solely responsible for a certain subset of those expenses and fees under Federal Rule of Civil Procedure 26(g). *Id.*[4]

---

[3] Attorney Steven Warshawsky, who argued the appeal, was not counsel below and thus was not sanctioned by the district court.

[4] The district court subsequently determined that the Federal Reserve was "entitled to $53,808 in attorneys' fees and costs," with "$2,400 of those fees" being the sole responsibility of counsel for Gardner-Alfred and Diaz. Special App'x 65.

Second, the district court imposed adverse inference instructions with respect to the documents that it found were "intentionally" and in "bad faith" not turned over by Gardner-Alfred and Diaz. *Id.* at *17.[3] The district court concluded that adverse inference instructions were warranted because "[n]o less stringent sanctions would be sufficient either to cure the prejudice to [the Federal Reserve] or to satisfy the deterrent value of sanctions." *Id.*

C.     *Motion for Summary Judgment*

After the district court granted the sanctions motion, the Federal Reserve moved for summary judgment on Diaz's and Gardner-Alfred's remaining claims. On September 25, 2023, the district court granted summary judgment to the Federal Reserve on both Gardner-Alfred's and Diaz's claims and entered final judgment.

On Gardner-Alfred's claims, the district court concluded that the Federal

---

[3] The specific adverse inference instructions that the district court ordered are that: (1) Gardner-Alfred "has withheld documents regarding her vaccination exemption package"; (2) "Diaz has withheld the [e]lectronic [n]otes and URL [l]ist"; and (3) "the documents withheld by Gardner-Alfred regarding the contents of her vaccination exemption package and her payment to the 'Reverend Dr.' Valentine would show she purchased the same vaccination exemption package, in the same way and for the same amount, as the [Federal Reserve's] independent investigator." *Gardner-Alfred*, 2023 WL 3495091, at *18.

Reserve was entitled to summary judgment because Gardner-Alfred "failed to

identify sufficient evidence to create a genuine issue of material fact" that her

objection to receiving the Covid-19 vaccine "was based in sincerely held religious

beliefs." *Gardner-Alfred v. Federal Reserve Bank of New York*, No. 22-cv-1585, 2023

WL 6214863, at *12, *15 (S.D.N.Y. Sept. 25, 2023). The district court reasoned that

Gardner-Alfred had failed to raise a fact issue because:

> her opposition to the vaccine is based on a purported
> religion to which there is no evidence, other than her
> conclusory say-so, that she ever belonged, whose
> practices she never followed (with the exception of her
> opposition to the vaccine), and from which she obtained
> an "affidavit" that is available to anyone who would
> pay.

*Id.* at *12.

Similarly, on Diaz's claims, the district court concluded that the Federal

Reserve was entitled to summary judgment because she failed to show that her

objection to the vaccination policy "was based in sincerely held religious beliefs."

*Id.* The district court explained that this is so because Diaz held secular objections

to the vaccines; she "act[ed] in a manner inconsistent with her claimed religious

views"; "[t]here is no evidence that [Diaz] held the views that she now holds at

any time either before or after [the Federal Reserve] required her to take the

10

Covid-19 vaccine"; and "Diaz offer[ed] no evidence other than her own say-so to support the notion that she has a sincere religious objection to the Covid-19 vaccine." *Id.* at *16–18. In the alternative, the district court concluded that the Federal Reserve was entitled to summary judgment on Diaz's claims because she failed to show that the vaccination policy "conflict[ed] with [her] views, even if those views were sincerely rooted in religion." *Id.* at *12. Specifically, the district court construed Diaz's objection as one against "any vaccine or medicine that was manufactured with or contains the cells of human fetuses." *Id.* at *18. Then, based on that interpretation of Diaz's beliefs, the district court concluded that "no reasonable jury could find that a requirement that Diaz take either the Moderna or Pfizer vaccine would violate [her] views" because "[i]t is not disputed that the Moderna and Pfizer vaccines do not contain human fetal cells." *Id.*

> D.    *This Appeal*

Diaz and Gardner-Alfred then timely appealed the district court's sanctions order and summary judgment decision. In the posture in which this case comes to us on appeal, we need not adjudicate the merits of Gardner-Alfred's and Diaz's contention that the Federal Reserve's actions infringed their religious liberties in violation of federal law. Instead, our task is more limited: we

must determine whether Gardner-Alfred and Diaz adduced sufficient evidence

to create a genuine dispute of material fact as to whether their sincerely held

religious beliefs conflicted with the vaccination policy. Accordingly, we set forth

in considerable detail the evidentiary record with respect to the plaintiffs-

appellants' asserted beliefs.

## II.    Factual Record on Summary Judgment

### A.    *Diaz's Religious Beliefs*

We start with Diaz. Diaz claims that her religious beliefs as a Catholic

prohibit her from receiving, in most circumstances, vaccines "created using

human cell lines derived from abortion," Decl. of Jeanette Diaz ¶ 33, *Gardner-*

*Alfred v. Federal Reserve Bank of New York*, No. 22-cv-1585 (S.D.N.Y. Apr. 19, 2022),

ECF No. 30, which she explained encompasses any vaccine that is "derived

from," "manufactured with," or "produced with aborted [fetal] cell lines," App'x

957, 972, 1227. She has no religious objections, however, to receiving vaccines that

do not "contain" and "are not manufactured with aborted fetal cell lines," and

she would take any such vaccine if her "doctor recommended it." *Id.* 999–1000.

Diaz believed that receiving a Covid-19 vaccine would be inconsistent with

those religious convictions. Accordingly, on August 30, 2021, she asked her

12

pastor, who was a member of the Archdiocese of Newark, to sign a template letter, printed on the letterhead of the Colorado Catholic Conference, that explained why Diaz's beliefs as a Catholic prohibited her from receiving a Covid-19 vaccine. Her pastor, however, refused to sign the letter in keeping with the official policy of the Archdiocese of Newark that "it is not possible for a Catholic to claim an exemption from vaccination on religious grounds" based on official Catholic doctrine, but that "[l]ike anyone else, a Catholic may claim a personal exemption on the grounds of conscience." *Id.* 1050. The pastor provided a copy of that official policy to Diaz.

Despite this setback, Diaz remained steadfast in her objection, because she believed that receiving a Covid-19 vaccine would "contradict[]" the teachings of the Catholic Church that congregants are to "follow [their] moral conscious [sic]" and comply with the Fifth Commandment's prohibition on murder. *Id.* 1226–27. Diaz therefore submitted the letter from the Colorado Catholic Conference to the Federal Reserve with her religious accommodation request, only with her signature instead of her pastor's. In keeping with her professed religious beliefs, the letter explains that "a Catholic may determine that . . . she ought to refuse certain vaccines" based on the "moral duty to refuse the use of medical products,

including certain vaccines, that are created using human cell lines derived from abortion." *Id.* 64.

There is also evidence in the record, however, that Diaz had *secular* objections to receiving a Covid-19 vaccine. The Federal Reserve contends that the presence of such non-religious objections calls into question the sincerity of her religiously-based objection. For example, there is evidence that on August 22, 2021, a week before approaching her pastor about signing the template letter, Diaz attended a webinar run by Gary Null (a secular figure) entitled "How To Survive COVID." *Id.* 1037. A URL list that was distributed to the webinar's attendees included links to documents with titles such as "Review of Ivermectin Efficacy," "White Paper - Experimental Covid Vaccines," and "Preventing Vaccine Mandates Toolkit," which raise facially *non-religious* concerns about the Covid-19 vaccines. *Id.* 1039. Furthermore, Diaz submitted a request for a *medical* exemption from the vaccination policy, in tandem with her religious accommodation request, but ultimately stopped pursuing a medical accommodation because her doctor disagreed with her about whether she should be vaccinated.

Additionally, after submitting her accommodation request, Diaz continued

14

to consume media that raised secular objections to the Covid-19 vaccines. Between October 2021 and March 2022, Diaz "subscribed to at least eight email newsletters from anti-vaccination sources from which she received hundreds of emails opposing Covid-19 vaccination on secular grounds." *Id.* 1208–09 ¶ 50. For example, Diaz received an email from Lawrence B. Palevsky's Holistic Child Health Newsletter that stated that "the so-called SARS-CoV-2 virus exists only as a mental construct whose existence in the real world has been disproven by the science itself" and referred to the Covid-19 vaccines as "murder shots." *Id.* 1066–67. Diaz also sent emails and memes raising non-religious concerns about the Covid-19 vaccines to Gardner-Alfred. For example, in February 2022, Diaz forwarded to Gardner-Alfred an email from Project Veritas that raised concerns about "the FDA potentially hiding the fact that annual COVID shots will be enforced," *id.* 1077–78, and in December 2021, Diaz sent Gardner-Alfred a meme that rearranged the letters of "Delta" and "Omicron" into "Media Control," *id.* 1082.

In addition to the evidence that Diaz had non-religious concerns about the Covid-19 vaccines, there is also evidence that Diaz may have acted inconsistently with her professed objection to receiving medications created from aborted fetal

15

cells. Specifically, in the past, Diaz has taken medications without first

ascertaining whether they were "made using aborted fetal cell lines." *Id.* 971,

996–97. She explained that behavior by noting that as long as she does not know

that a medication is manufactured with aborted fetal cell lines, she can take it.

She distinguished the Covid-19 vaccine from those medications on the grounds

that she "believe[d]" that the Covid-19 vaccines were manufactured with aborted

fetal cells. *Id.* 972.

     Finally, the record contains scientific evidence about the creation of the

mRNA vaccines that casts doubt on whether Diaz's professed religious beliefs

actually conflict with getting vaccinated against Covid-19. Specifically, Dr. Clare

Rock, the Federal Reserve's expert, opined that:

> The mRNA COVID-19 vaccines produced by Pfizer and
> Moderna do not use any fetal cells cultures in order to
> manufacture or produce the vaccine. In other words, the
> mRNA vaccines themselves do not contain any aborted
> fetal cells or fetal cell cultures, nor are they
> manufactured or produced with such cells or cell
> cultures.

*Id.* 881. That evidence suggests that, if Diaz objects only to vaccines that contain

or were manufactured with aborted fetal cell lines, receiving the Pfizer or

Moderna vaccines would not contravene her religious beliefs. Critically,

16

however, although the mRNA vaccines themselves do not contain and were not directly made with aborted fetal cells, the record also contains evidence that aborted fetal cell lines "were used in testing during research and development of the mRNA vaccines." *Id.* 1300.

In sum, there was competing evidence in the record with respect to whether Diaz's sincerely held religious beliefs conflicted with the Federal Reserve's vaccination policy. On the one hand, Diaz claimed that she had a religious objection to the Covid-19 vaccines, based on her Catholic faith, because she believed that they were created using aborted fetal cells. On the other hand, there is evidence that Diaz also had secular objections to the Covid-19 vaccines, may have acted inconsistently with her professed religious beliefs in utilizing other medical products, and had been instructed by her Catholic pastor that the Church did not object to the Covid-19 vaccines. Moreover, the uncontradicted scientific evidence in the record was that mRNA Covid-19 vaccines do not contain and were not manufactured with aborted fetal cells.

B.    *Gardner-Alfred's Religious Beliefs*

Gardner-Alfred testified that for the past twenty years, she has belonged to the Temple of the Healing Spirit, and has actively attended its virtual services.

17

The Temple of the Healing Spirit "prioritizes holistic approaches to health focused on diet and spiritual self-awareness, and opposes the invasive techniques of traditional Western medicine." Decl. of Lori Gardner-Alfred ¶ 35, *Gardner-Alfred v. Federal Reserve Bank of New York*, No. 22-cv-1585 (S.D.N.Y. Apr. 19, 2022), ECF No. 29. Consistent with those principles, Gardner-Alfred asserts that she "live[s] and believe[s] in a more holistic, organic way of living" and does not "put foreign, mankind medicines," such as Covid-19 tests or vaccines, "into [her] body." App'x 1255–56. Accordingly, the affidavit that Gardner-Alfred submitted to the Federal Reserve with her religious accommodation request claimed that her "sincere and conscientiously held [r]eligious [b]eliefs and [c]onvictions" prohibit her from receiving the Covid-19 vaccine and undergoing Covid-19 testing. *Id.* 60.

Gardner-Alfred's deposition testimony, however, casts serious doubts on the veracity of her claimed longstanding affiliation with the Temple of the Healing Spirit. Despite attesting in her declaration that she "participate[s] virtually in services and meetings as a general matter," Decl. of Lori Gardner-Alfred ¶ 10, Gardner-Alfred admitted at her deposition that she was *not* attending virtual services at the time she wrote that declaration. She continued to

18

insist that she had attended virtual services in the past. But when the Federal Reserve's counsel then asked her what her declaration was referring to and what type of services she had joined in the past, Gardner-Alfred responded: "Well, just what it says, you know, virtual services, meetings as a general matter." App'x 899. Unsatisfied with that answer, the Federal Reserve's counsel tried again to get more details about the services, asking Gardner-Alfred "What happens at those virtual services?" *Id.* Yet the only description that Gardner-Alfred gave was: "We just talk about, you know, uplifting spirituality, you know, reconnecting." *Id.*

Beyond that description, Gardner-Alfred could provide almost no details about the virtual services. Gardner-Alfred testified that she could not "recall" how many virtual services she attended, nor whether she had attended more than five virtual services over the past five years. *Id.* 900. And when prompted by the Federal Reserve's counsel to describe "one service that [she] recall[ed] attending," Gardner-Alfred did not talk about a virtual service at all, instead stating that: "It was a service that was *in person*." *Id.* 901 (emphasis added). But the elaboration she provided about that service was just as vague as her prior description of the virtual services, stating only that the service was "[i]n Brooklyn" at a "home." *Id.* 901–02. Nor could she "recall" the name of *anyone*

with whom she had attended a service. *Id*. 947.

Moreover, her testimony about the one detail that she did attempt to provide about the virtual services – how she joined them – was inconsistent. Gardner-Alfred claimed that it was possible to join the virtual services via a link, but when first asked if she had ever been sent a link to a virtual service, she said, "No." *Id.* 899. Soon thereafter, however, when the Federal Reserve's counsel asked her how she found the links to the virtual services, Gardner-Alfred claimed that links to the virtual services "were sent to" her via "[e]mail." *Id.* 900. But Gardner-Alfred has not produced a single email containing a link to a virtual service during the course of this entire litigation, despite demands from the Federal Reserve to produce such emails.

Furthermore, the only documentary evidence tying Gardner-Alfred to the Temple of the Healing Spirit is a "vaccination exemption package." *See id.* 1200 ¶ 22. According to Gardner-Alfred, she received that package from the Reverend Dr. Phillip Valentine, the founder of the Temple of the Healing Spirit. The package included: (1) the affidavit that she signed and submitted with her religious accommodation request, and (2) a handwritten letter signed by Reverend Valentine, which states that "Lori Gardner-Alfred is a member in

20

excellent standing with our Church." *Id.* 952. Although the letter on its face attests to Gardner-Alfred's affiliation with the Temple of the Healing Spirit, Gardner-Alfred's conflicting testimony about how she obtained the package, and evidence in the record that anyone can obtain the package for a fee, without any affiliation to the Temple of the Healing Spirit, severely undermines her claims to have belonged to the Temple.

First, Gardner-Alfred gave vague and contradictory testimony about how she obtained the vaccination exemption package. At her deposition, Gardner-Alfred claimed that in exchange for the vaccination exemption package, she made a monetary donation to the Temple. Although she could not remember at the time how much money she gave Reverend Valentine, she did represent that she made the donation using "Zelle or Cash App." *Id.* 941. But after she failed to produce any documentation of that electronic payment in response to discovery demands, Gardner-Alfred gave a different account at a court hearing. There, she testified that she gave Reverend Valentine $487 in exchange for the vaccination exemption package, but then she claimed that she made that cash payment in person to an "affiliate" of Reverend Valentine. 5/9/23 Hr'g Tr. 52:2–22, 60:17–61:6, 67:21–25, 68:9–10, *Gardner-Alfred v. Federal Reserve Bank of New York*, No. 22-cv-

1585 (S.D.N.Y. May 9, 2023), ECF No. 150. But she could provide no details about how she made this in-person payment in the middle of the pandemic.

(1) She gave vague testimony about *where* the payment was made. When the Federal Reserve's counsel first asked her "where" the hand-off occurred, Gardner-Alfred responded, "It was just a meet up." *Id.* 68:19–21. Counsel then immediately asked again "[w]here" the meeting occurred, to which Gardner-Alfred stated, "I think it was Brooklyn." *Id.* 68:22–23. But when asked "[w]here in Brooklyn," Gardner-Alfred, at first, could not "recall [the] exact location." *Id.* 68:24–25. Counsel pressed on, asking if the meeting was in a building, on a street, or in a park. *Id.* 69:1–6. Again providing almost no details, Gardner-Alfred simply confirmed that the meet occurred on the street (not a building) but stated that she could not "remember" whether it happened in a park. *Id.* It was only when the court finally inquired if she had "an approximate location" for the hand-off that Gardner-Alfred offered the meeting had occurred "near Fulton Street in Brooklyn." *Id.* 69:7–9.

(2) Similarly, Gardner-Alfred could provide no details about *to whom* she made the payment. At the hearing, she could not remember the name of the person that she met, nor could she explain how she knew to whom to hand the

money in light of the fact that she had never met that person, or even seen a photograph of them, before allegedly handing them $487 in cash. *Id.* 68:8–10, 69:11–70:21. Her only explanation for how she knew to whom to hand the money was it was "[b]y way of Dr. Valentine," but when asked what exactly that meant, Gardner-Alfred gave the following convoluted response: "Meaning, I had to get the individual's – how the person – who the person was through him." *Id.* 69:11–70:8. When counsel continued to press for more details, Gardner-Alfred did not directly answer, instead giving responses such as "I'm not sure what you are asking me" and "I'm not sure what else you want me to say," before finally proclaiming, "I just don't remember every detail about the transaction and the meet up, but it was what it was." *Id.* 70:9–21.

Moreover, beyond the conclusory testimony about how she obtained the vaccination exemption package, there is record evidence that anyone could obtain the same vaccination exemption package as Gardner-Alfred without having any affiliation to the Temple of the Healing Spirit. On his Facebook page, Reverend Valentine advertises the vaccination exemption package for sale to the general public. Accordingly, the Federal Reserve's independent investigator, Adam Deutsch, was able to call Reverend Valentine and purchase the vaccination

23

exemption package for $487, the same amount that Gardner-Alfred says she paid for hers. The package Deutsch received included the same affidavit and handwritten letter that Gardner-Alfred had received. Tellingly, the handwritten letter stated that "Adam Deutsch is a member in excellent standing with our Church," App'x 798, even though Deutsch had no prior affiliation with the Temple.

Finally, there is evidence that Gardner-Alfred, like Diaz, acted inconsistently with her professed religious opposition to Western medicine. Over the past decade, Gardner-Alfred has taken prescription medications, injections, and over-the-counter supplements; had two surgeries; and had implants inserted. Gardner-Alfred admitted that certain of those procedures and medications, including "biopsies, a lesion removal, anesthesia injections, tear duct implants, and dental implants," were "against [her] beliefs." *Id.* 939. As most relevant here, Gardner-Alfred confessed that she took a Covid test in November 2021, despite considering it "an invasive technique of Western medicine" that "[p]ossibly" violates her religious beliefs. *Id.* 910. Her only explanation for how she could take the test, without violating her religious beliefs, was that she "just felt at that moment it wasn't invasive." *Id.* 910–11.

24

In sum, as with Diaz, there was significant evidence calling into question the veracity of Gardner-Alfred's claimed religious beliefs. But, unlike Diaz, Gardner-Alfred's own testimony directly contradicted her professed religious beliefs and affiliation with the Temple of the Healing Spirit.

## DISCUSSION

## I.    Summary Judgment

On appeal, both Gardner-Alfred and Diaz argue that the district court relied on impeachment evidence to impermissibly discount the sincerity of their professed beliefs, and Diaz separately argues that the district court's conclusion that the vaccination policy did not conflict with her religious views was based on an unduly narrow construction of her religious views. For the reasons discussed below, we conclude that the district court properly granted summary judgment against Gardner-Alfred but erred in granting summary judgment against Diaz.

### A.    Standard of Review

"When a district court grants summary judgment for the defendant, we review de novo, resolving all ambiguities and drawing all permissible factual inferences in favor of the plaintiff[s]." Francois v. Metro-North Commuter R.R. Co., 107 F.4th 67, 71 (2d Cir. 2024). We "will affirm when there is 'no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law.'" *Windward Bora LLC v. Sotomayor*, 113 F.4th 236, 241 (2d Cir. 2024), quoting Fed. R. Civ. P. 56(a).

B.    *Diaz's Claims*

First, we address the district court's grant of summary judgment against Diaz, starting with whether she raised a genuine dispute of material fact regarding the sincerity of her religious beliefs before turning to whether she adduced sufficient evidence that the Federal Reserve's vaccination policy burdened her religious beliefs. For the reasons discussed below, we conclude that Diaz has raised a genuine dispute of material fact on both issues and accordingly vacate the district court's grant of summary judgment against Diaz.

1.    *Sincerity of Diaz's Religious Beliefs*

Diaz contends that the district court made improper credibility determinations and overly relied on impeachment evidence in order to conclude that her religious beliefs were not sincere. We agree.

Each of the federal laws that Diaz claims that the Federal Reserve violated require her to show that her beliefs are religious and sincerely held. *Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 574 (2d Cir. 2002) (Free

Exercise claim); *Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 481–82 (2d Cir. 1985) (Title VII claim); *Tanvir v. Tanzin*, 120 F.4th 1049, 1058 (2d Cir. 2024) (RFRA claim). In particular, the "[s]incerity analysis seeks to determine an adherent's good faith in the expression of h[er] religious beliefs." *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984). The core purpose of this analysis is to "differentiat[e] between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud." *Id.*

Here, Diaz testified that her religious beliefs preclude her from receiving the Covid-19 vaccine because she believes it is made with aborted fetal cell lines. The Federal Reserve argues that the district court properly concluded that Diaz's testimony was insufficient to create a disputed issue of fact because it offered undisputed evidence that Diaz had secular objections to the vaccines, acted inconsistently with her religious beliefs, and submitted the vaccine exemption letter after her pastor refused to sign it. While the Federal Reserve's evidence certainly impeaches Diaz's credibility, and might persuade a factfinder to reject her claim that her objection to vaccination was sincerely rooted in religious belief, we conclude that none of its evidence would *preclude* a reasonable jury from crediting Diaz's contrary testimony about her religious beliefs.

27

First, the Federal Reserve's evidence did indicate that Diaz had secular concerns about the Covid-19 vaccines. Diaz does not dispute that she briefly requested a medical accommodation from the vaccination policy, and that she sought out, consumed, and shared media that opposed the Covid-19 vaccines on secular grounds. The problem with the district court's analysis is that a jury could draw competing, permissible inferences from this evidence. On the one hand, the jury could infer that Diaz is "fraudulently hiding secular interests behind a veil of religious doctrine." *Int'l Soc'y for Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 441 (2d Cir. 1981). On the other hand, the jury could infer that Diaz has *both* secular *and* religious objections to the Covid-19 vaccines, which a reasonable jury could interpret to mean that her objection to the vaccination policy was grounded in her sincere religious beliefs despite her concurrent secular objections. *See Callahan v. Woods*, 658 F.2d 679, 684 (9th Cir. 1981) ("[A] coincidence of religious and secular claims in no way extinguishes the weight appropriately accorded the religious one.").[4] The job of choosing between those inferences is for the jury, not

---

[4] We note that in the Title VII context, our sister circuits have held that employees who have both religious and secular objections to vaccination requirements can still make out a failure-to-accommodate claim. *See, e.g.*, *Passarella v. Aspirus, Inc.*, 108 F.4th 1005, 1009–11 (7th Cir. 2024) (explaining that "the fact that an accommodation request also invokes or, as here, even turns upon secular

the district court on summary judgment. *See Tafolla v. Heilig*, 80 F.4th 111, 125 (2d Cir. 2023) ("[C]ompeting inferences (along with any credibility assessments to draw such inferences) cannot be resolved by a court on summary judgment."); *H.L. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1012 (2d Cir. 1989) (similar).

Second, the Federal Reserve's evidence that Diaz may have acted inconsistently with her religious beliefs, in that she took medications without first checking to ensure they were not "made using aborted fetal cell lines," also does not justify the district court's conclusion. App'x 971, 996–97. We have instructed district courts that the sincerity "analysis is most useful where extrinsic evidence is evaluated," and we gave, as an example, that "an adherent's belief would not be 'sincere' if he acts in a manner inconsistent with that belief." *Int'l Soc'y for Krishna Consciousness*, 650 F.2d at 441. But we did not suggest that such inconsistent behavior would be dispositive, for even in the very case where we gave that example, we did not give controlling weight to an "apparent

---

considerations does not negate its religious nature"); *Sturgill v. American Red Cross*, 114 F.4th 803, 809–10 (6th Cir. 2024) (explaining that the fact "that there may be both religious and secular reasons for an act does not elevate the latter over the former").

inconsistency between doctrine and [the adherents'] actual behavior." *See id.* at 442. Nor would such a black-and-white rule be appropriate, because "even the most sincere practitioner may stray from time to time." *Moussazadeh v. Texas Dep't of Crim. Just.*, 703 F.3d 781, 791 (5th Cir. 2012); *see also Grayson v. Schuler*, 666 F.3d 450, 454 (7th Cir. 2012) (explaining "that a sincere religious believer doesn't forfeit his religious rights merely because he is not scrupulous in his observance"). Accordingly, we conclude that the evidence of Diaz's potentially inconsistent behavior is, at best, impeachment evidence that a jury could rely on to discredit Diaz's testimony, but it is not, in and of itself, sufficient to support a grant of summary judgment, because at this stage of the proceedings, "the court 'may not make credibility determinations or weigh the evidence.'" *Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 227 (2d Cir. 2024), quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (emphasis omitted).

Third and finally, the Federal Reserve's evidence that the letter Diaz submitted with her religious accommodation request was (1) printed on the letterhead of a Catholic organization that Diaz was not affiliated with, and (2) signed by Diaz herself after her pastor refused to sign it, does not mean the district court could properly resolve Diaz's sincerity as a matter of law. To start,

30

we do not find it relevant that Diaz submitted a letter with views attributable to the Colorado Catholic Conference, rather than her own pastor, who adhered to the Archdiocese of Newark's official policy that a Catholic cannot "claim an exemption from vaccination on religious grounds." App'x 1050. It is axiomatic that "the guarantee of free exercise is not limited to beliefs which are shared by all members of a religious sect." *Thomas v. Review Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 715–16 (1981). *See also Ford v. McGinnis*, 352 F.3d 582, 589–91 (2d Cir. 2003) (explaining that a subjective, rather than objective, test applies to evaluating Free Exercise claims). It accordingly does not matter whether her views align with the dogma articulated by a particular representative of Catholicism; what matters is that she believed that receiving the Covid-19 vaccine would be inconsistent with the teachings of the Catholic Church. Even if the Catholic hierarchy regarded her belief as heretical – and there is no evidence that it did – her pastor confirmed that she could seek a religious exemption based on her own conscientious beliefs without indicating that such beliefs would sever her ties with the Church. What matters to the law is whether *she* sincerely believed that the use of Covid-19 vaccines was contrary to her religious convictions. Indeed, a reasonable jury could conclude that Diaz's persistence in

31

the face of her pastor's refusal to sign the letter because of her own religious convictions supports, rather than undermines, the sincerity of her beliefs, as the jury could reason that Diaz was so steadfast in her views that she was willing to break with the views of her congregation. That Martin Luther was regarded by the Catholic Church as a heretic does not mean that his beliefs were not sincerely based on religious principles and, indeed, on principles derived from his interpretation of the Church's own teachings.

Overall then, the evidence that the district court relied upon to grant summary judgment to the Federal Reserve, at best, impeaches the credibility of Diaz's testimony about the sincerity of her religious opposition to the Covid-19 vaccines. This case is thus analogous to *Patrick v. LeFevre*, in which the plaintiff claimed that his Free Exercise rights were violated when prison officials denied his request for "permission to practice, exercise, promulgate, and gather together with others for the purpose of [worshiping] his faith of Islam, as a Five Percenter" on the grounds that "The Five Percenter Nation of Islam is not recognized as a religious group." 745 F.2d at 155–56 (quotation marks omitted). Similar to the present case, at summary judgment, the defendants there offered evidence to impeach the sincerity of the plaintiff's beliefs, and the plaintiff

offered only his own statements to support his sincerity. *Id.* at 156 & n.3, 159. In those circumstances, we explained that the district court erred when it granted summary judgment to the defendants because "[t]he submission of . . . circumstantial evidence challenging [the plaintiff's] credibility yields an effect contrary to the one intended; it only accentuates the factual conflicts present in this suit and punctuates the need for a full factual exposition at which these disputes can ultimately be resolved." *Id.* at 160. So too here.

Accordingly, in line with our precedent, we conclude that the district court improperly resolved disputed issues of material fact about the sincerity of Diaz's religious beliefs.

### 2.    *Burden on Diaz's Religious Beliefs*

Because we conclude that there are factual disputes about the sincerity of Diaz's religious beliefs, we must next address the district court's alternative ground for granting summary judgment against her, the absence of evidence that Diaz's religious beliefs conflicted with the Federal Reserve's vaccination policy. Diaz contends that the district court reached its conclusion by impermissibly drawing inferences against her to narrow the scope of her claimed religious objection to the Covid-19 vaccines. Once again, we agree.

To prevail on each of her federal claims, Diaz must show that her religious beliefs conflicted with or were burdened by the Federal Reserve's vaccination policy. *See* 42 U.S.C. § 2000bb-1(a) (RFRA claim); *Knight v. Connecticut Dep't of Pub. Health*, 275 F.3d 156, 167 (2d Cir. 2001) (Title VII claim); *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022) (Free Exercise claim). The district court concluded that "Diaz's objection to the Vaccination Policy . . . was based at best on a mistaken understanding" because the mRNA Covid-19 vaccines do not "contain, and are not manufactured with aborted fetal cell lines." *Gardner-Alfred*, 2023 WL 6214863, at \*20. But to reach the conclusion that Diaz could receive one of the mRNA vaccines, the district court had to construe Diaz's religious objection as limited "to the ingestion of vaccines that *contain* or *are manufactured with* aborted fetal cell lines" rather than encompassing vaccines where aborted fetal cells were used in the development of the vaccine. *See id.* at \*19–21 (emphasis added). The district court's reasoning and conclusion were improper.

The district court's first error is that it impermissibly narrowed the scope of Diaz's religious objection. As we have already explained, Diaz testified that she objects to receiving vaccines that are "derived from," "manufactured with," or "produced with aborted [fetal] cell lines." App'x 957, 972, 1227. Drawing all

34

permissible inferences in her favor, as the court must at summary judgment, her objection could easily be construed to include vaccines that were tested or developed using aborted fetal cells, even if such cells were not present in, or used to manufacture, the particular dose with which Diaz would be injected. *See Francois*, 107 F.4th at 71 (instructing that the court must "draw[] all permissible factual inferences in favor of the plaintiff" when the defendant moves for summary judgment). A jury could quite plausibly conclude that such a view comports with an ordinary person's understanding of what it means to manufacture, produce, or derive a vaccine. In construing Diaz's objection to permit such vaccines, the district court not only did not "draw[] all permissible factual inferences" in Diaz's favor, *see id.*, but it also impermissibly "dissect[ed] [her] religious beliefs" when her beliefs were "not articulated with the clarity and precision that a more sophisticated person," such as a scientist acquainted with the mechanics of vaccine production, or a theologian construing philosophical doctrines "might employ," *Thomas*, 450 U.S. at 715. That was reversible error.

The district court's second error was that it assessed the objective validity of Diaz's belief that receiving the Covid-19 vaccine would be contrary to her religious views. The district court explicitly found that "Diaz's objection to the

35

Vaccination Policy . . . was based at best on a mistaken understanding" about the mRNA vaccines. *Gardner-Alfred*, 2023 WL 6214863, at *20. That was impermissible because "courts are not permitted to ask whether a particular belief is appropriate or true." *Jolly v. Coughlin*, 76 F.3d 468, 476 (2d Cir. 1996).

In fact, the district court's error is almost identical to an argument that the defendants raised and we rejected in *Jolly*. There, the plaintiff "refused to submit to a PPD test [for tuberculosis], claiming that accepting artificial substances into the body is a sin under the tenets of Rastafarianism." *Id.* at 472. The defendants argued "that the PPD test d[id] not burden the plaintiff's religious beliefs" because the PPD "test involves the injection of a naturally derived protein rather than an artificial substance." *Id.* at 476. In rejecting that argument, we cautioned that such evidence, which "seek[s] to demonstrate that, as an objective matter, [a] plaintiff's belief is not accurate or logical [or] that [a] plaintiff has been in some way misinformed," cannot resolve whether a policy burdens a plaintiff's religious beliefs because the court has "no competence to examine whether [a] plaintiff's belief has objective validity." *Id.* (quotation marks omitted).

That appears to be the very trap that the district court fell into here. The district court improperly gave dispositive weight to the fact that as an empirical

matter the mRNA vaccines were not derived from, manufactured with, or produced with aborted fetal cells, when what actually matters at summary judgment is that a reasonable jury could find that Diaz believed the Covid-19 vaccines were developed through the use of aborted fetal cells and that taking such a vaccine would contravene her religious beliefs.

Accordingly, we conclude that the district court improperly resolved disputed issues of fact when it found that the Federal Reserve's vaccination policy did not burden or conflict with Diaz's religious beliefs. Furthermore, because the other basis upon which the district court granted summary judgment against Diaz was also improper for the reasons we have already explained, we vacate the grant of summary judgment to the Federal Reserve on Diaz's claims and remand for further proceedings.

C.    *Gardner-Alfred's Claims*

We now turn to whether the district court properly granted summary judgment against Gardner-Alfred on the ground that she failed to raise a genuine dispute of material fact regarding the sincerity of her religious beliefs. Like Diaz, Gardner-Alfred argues that the district court improperly resolved her sincerity as a matter of law because her own testimony about her religious beliefs, coupled

37

with her documentary evidence (i.e., the vaccination exemption package), creates a genuine dispute of material fact. We disagree.

Of course, as with Diaz, the evidence that Gardner-Alfred acted inconsistently with her professed religious beliefs is not a sufficient basis upon which to resolve Gardner-Alfred's sincerity as a matter of law. The difference here is that unlike Diaz, the evidence of Gardner-Alfred's religious beliefs is so wholly contradictory, incomplete, and incredible that no reasonable jury could accept her professed beliefs as sincerely held.

We start first with Gardner-Alfred's own testimony about her religious beliefs. We recognize that a plaintiff's statements about her religious beliefs can raise a genuine dispute of material fact as to the sincerity of those beliefs. *See, e.g.*, *Patrick*, 745 F.2d at 156 & n.3, 159–60. That unremarkable observation aligns with our hesitance to grant summary judgment "where subjective issues regarding a litigant's state of mind, motive, sincerity or conscience are squarely implicated," *id.* at 159, and with the general prohibition on assessing "credibility" or "weigh[ing] the evidence" on summary judgment, *Moll*, 94 F.4th at 227, quoting *Kaytor*, 609 F.3d at 545 (emphasis omitted). But that does not mean summary judgment is automatically improper when a plaintiff offers testimony about her

state of mind. "[P]laintiffs may not avoid summary judgment by simply declaring that state of mind is at issue." *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 61 (2d Cir. 1998). "Although courts are generally reluctant to dispose of a case on summary judgment when mental state is at issue, it is permissible to do so where there are sufficient undisputed material facts on the record to make the question appropriate for summary judgment." *Lipton v. Nature Co.*, 71 F.3d 464, 472 (2d Cir. 1995). Specifically, as is relevant here, "in the rare circumstance where the plaintiff relies almost exclusively on [her] own testimony, much of which is contradictory and incomplete, to establish a triable issue of fact," we will find that such "testimony raise[s] only a sham issue of fact" where "the record contradictions with [the plaintiff's] testimony [are] inescapable and unequivocal." *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 86 (2d Cir. 2019) (quotation marks omitted) (first alteration in the original).

This is such a case. Although Gardner-Alfred claims that her opposition to the Covid-19 vaccine stems from her twenty-year membership at the Temple of the Healing Spirit, she could give almost no details about her purported membership in the Temple, and what details she did give were often contradicted directly by other portions of her own sworn testimony. Most

39

strikingly, her description of the virtual services that she claims to have attended as evidence of her active participation at the Temple was devoid of concrete details, as she could recall almost nothing about the services, including what transpired during them, the names of anyone else who attended, or whether she had attended more than five services in the past five years. And with respect to the only detail that she did give (that she joined the services via a link), she could not keep her story straight: first she claimed that she never received a link to virtual services, but then a short time later, did a complete about-face and claimed that a link *had* been sent to her email. Perhaps not surprisingly, Gardner-Alfred has never produced a single email containing a link to a virtual service throughout this entire litigation.

Nor can the extrinsic evidence of her purported membership in the Temple of the Healing Spirit rehabilitate her contradictory, incomplete testimony. There are two problems with the vaccination exemption package that, in combination, are fatal to any claim that a reasonable jury could infer from the package that Gardner-Alfred's opposition to the Covid-19 vaccine stemmed from her affiliation with the Temple of the Healing Spirit. First, the vaccination exemption package was available for purchase to the general public, without any inquiry

40

into the purchaser's adherence to the doctrines or prior membership in the
Temple, as evidenced by the ability of the Federal Reserve's investigator to obtain
the same package as Gardner-Alfred, by paying the same amount of money that
Gardner-Alfred paid, without *any* prior affiliation with the Temple of the Healing
Spirit. Second, Gardner-Alfred once again offered contradictory explanations for
how she paid for the vaccination exemption package: first claiming she paid for it
electronically, and then, after she failed to produce documentary evidence that
she made an electronic payment, claiming she handed cash to an unidentified
affiliate of Reverend Valentine at a meet-up on some street in Brooklyn in the
middle of the pandemic, again without any recollection of exactly where the
meeting had occurred, who the person to whom she gave the money was, or how
she was able to recognize that person as the courier she was supposed to meet.
On that record, no reasonable jury could conclude that the vaccination exemption
package supports Gardner-Alfred's testimony that her opposition to the Covid-
19 vaccine stems from her religious beliefs as a member of the Temple of the
Healing Spirit.

At bottom, Gardner-Alfred had offered no tangible evidence of her
affiliation with the Temple of the Healing Spirit, when a reasonable juror would

41

expect to see at least some documentary evidence, such as proof she was sent a link to a virtual service, to back up her claim that she has been a member of the Temple for over twenty years. Even more telling is that despite being given repeated opportunities to expound upon her longstanding affiliation with the Temple, Gardner-Alfred claimed she could recall almost nothing, and the very few details she did claim to recall were contradicted by other aspects of her testimony. Ultimately, Gardner-Alfred has provided no evidence that she has *ever* acted consistently with her professed religious beliefs other than her refusal to get the Covid-19 vaccine. On that record, we conclude that the district court properly granted summary judgment to the Federal Reserve on Gardner-Alfred's claims.

That is not a conclusion we reach lightly. We are mindful of "the judiciary's incapacity to judge the religious nature of an adherent's beliefs," *Patrick*, 745 F.2d at 157, as well as the difficulties that plaintiffs face in offering evidence that their religious beliefs are sincerely held. But, at the same time, such difficulties do not mean we can abdicate our responsibility to dismiss claims at summary judgment where the plaintiff fails to "'offer some hard evidence showing that [her] version of the events is not wholly fanciful.'" *Jeffreys v. City of*

*New York*, 426 F.3d 549, 554 (2d Cir. 2005), quoting *D'Amico v. City of New York*,

132 F.3d 145, 149 (2d Cir. 1998). We accordingly affirm the district court's grant of

summary judgment to the Federal Reserve on Gardner-Alfred's claims.

**II.      Sanctions Order**

Finally, we address Gardner-Alfred's and Diaz's contention that the

district court abused its discretion when it imposed sanctions on them for their

discovery misconduct. Specifically, they argue that the district court failed to

"consider[] whether a more modest sanction would have encouraged discovery

compliance," in light of their general unfamiliarity with the litigation process and

limited financial means. *See* Appellants' Br. 31. We disagree.

We review the district court's imposition of sanctions for abuse of

discretion and "the factual findings of the district court made in support of its

decision [to impose sanctions] for clear error." *Southern New England Tel. Co. v.

Global NAPs Inc.*, 624 F.3d 123, 143 (2d Cir. 2010). A district court abuses its

discretion if it makes "an error of law, a clearly erroneous finding of fact, or a

decision that cannot be located within the range of permissible options available

to the district court." *Funk v. Belneftekhim*, 861 F.3d 354, 365 (2d Cir. 2017).

Here, Gardner-Alfred and Diaz do not challenge the district court's factual

findings. Accordingly, it is undisputed that Gardner-Alfred and Diaz acted intentionally and in bad faith when they repeatedly flouted the district court's orders, neglected their discovery obligations under the Federal Rules, and withheld relevant documents that were potentially damaging to their case. Given the district court's "wide discretion in punishing failure to conform to the rules of discovery," *Outley v. City of New York*, 837 F.2d 587, 590 (2d Cir. 1988), we identify no abuse of discretion in the district court's decision to impose a modest $50,000 in attorneys' fees and three adverse inference instructions to sanction Gardner-Alfred's and Diaz's egregious, willful discovery misconduct.

Gardner-Alfred's and Diaz's arguments to the contrary are without merit. First, they assert that "[t]he Sanctions Order nowhere considers whether a more modest sanction would have encouraged discovery compliance." Appellants' Br. 31. That claim is contradicted by the record. The district court explicitly recognized that it was required to "impose the least harsh sanction that can provide an adequate remedy," and then carefully explained why the sanctions it imposed were proportional to Gardner-Alfred's and Diaz's flagrant discovery misconduct. *See Gardner-Alfred*, 2023 WL 3495091, at *16–18 (quotation marks omitted). Second, Gardner-Alfred and Diaz insinuate that their relative lack of

legal sophistication counsels in favor of less harsh sanctions. We disagree because their unfamiliarity with the litigation process does not excuse their intentional choice not to follow the court's orders. *See McDonald v. Head Crim. Ct. Supervisor Officer*, 850 F.2d 121, 124 (2d Cir. 1988) ("[A]ll litigants" regardless of their sophistication "have an obligation to comply with court orders," so "[w]hen they flout that obligation they . . . must suffer the consequences of their actions."). Moreover, the plaintiffs were represented by counsel, who was available to explain the nature of their obligations as litigants under the Federal Rules of Civil Procedure.

We accordingly affirm the district court's decision to impose sanctions on Gardner-Alfred, Diaz, and their counsel.

## CONCLUSION

We have considered the parties' remaining arguments and find them to be without merit. The district court properly granted summary judgment to the Federal Reserve on Gardner-Alfred's claims and appropriately imposed sanctions on Gardner-Alfred, Diaz, and their counsel. The district court, however, improperly granted summary judgment to the Federal Reserve on Diaz's claims. Accordingly, we AFFIRM in part and VACATE in part the

judgment of the district court and REMAND the case for further proceedings

consistent with this opinion.